UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN JOEY ROMERO,<br><br>    Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>    Defendant. | ) Case No.: 1:14-cv-01040- JLT<br>)<br>) ORDER DIRECTING ENTRY OF JUDGMENT IN<br>) FAVOR OF DEFENDANT, CAROLYN W.<br>) COLVIN, ACTING COMMISSIONER OF SOCIAL<br>) SECURITY, AND AGAINST PLAINTIFF<br>) STEPHEN ROMERO<br>)<br>)<br>)<br>) |

Plaintiff Stephen Romero asserts he is entitled to supplemental security income under Title XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the credibility of his subjective complaints. Because the ALJ identified clear and convincing reasons to support the adverse credibility determination, the administrative decision is **AFFIRMED**.

## BACKGROUND

On June 29, 2011, Plaintiff filed an application for benefits, in which he alleged disability beginning December 14, 2011. (Doc. 11-3 at 10) The Social Security Administration denied the application at the initial level and upon reconsideration. (*Id.*; Doc. 11-5 at 5-14) Plaintiff requested a hearing, and testified before an ALJ on January 22, 2013. (*Id.* at 10, 27) The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on February 12, 2013. (*Id.* at 10-19) Plaintiff filed a request for review of the decision with the Appeals Council,

1

which denied the request on May 2, 2014.  (*Id.* at 2-4)  Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

On July 2, 2014, Plaintiff initiated this action for judicial review of the ALJ's decision by filing a complaint pursuant to 42 U.S.C. § 405(g).  (Doc. 1)  Plaintiff filed his opening brief in the matter on May 27, 2015.  (Doc. 15)  Defendant filed a brief in opposition on June 15, 2015.  (Doc. 16)

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v.*

*Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 404.1520, 416.920(a)-(f).  The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927.

### A.     Relevant Medical Evidence

On October 16, 2008, Plaintiff underwent an x-ray examination of his lumbar spine.  (Doc. 11-8 at 2).  Dr. Steven Hansen found "straightening of the lordotic curve compatible with spasm." (*Id.*) Also, Dr. Hansen found "approximately 20% superior endplate compression deformity at L3, with similar deformity at L1," which "suggest[ed] sequelae of old trauma." (*Id.*)  Dr. Hansen found Plaintiff's disc spaces were "maintained," and there was "no evidence of spondylolisthesis." (*Id.*) However, Plaintiff had "[o]ccult spina bifida at the S1 level." (*Id.*)

Dr. Manolito Castillo, a psychiatrist, evaluated Plaintiff on June 23, 2011.  (Doc. 11-8 at 13-14) Plaintiff reported he had "a past history of depression." (*Id.* at 13)  Dr. Castillo noted Plaintiff said "[h]is father was physically abusive to him when he was young," and "[h]e was hospitalized twice as a teenager and given medications." (*Id.*)  Plaintiff reported he suffered "severe pain" following a vehicular accident in 2000 in which he "reportedly fractured L1 and L2." (*Id.*)  Plaintiff said he used marijuana, but it "ha[d] not been helpful in correcting the pain." (*Id.*)  Plaintiff "decided to seek psychiatric help" because he felt "depressed and hopeless," and his concentration and memory were "poor." (*Id.*)  However, Dr. Castillo opined that Plaintiff's "[m]emory and concentration are intact," and his "[i]nsight and judgement are good." (*Id.* at 14)  Dr. Castillo diagnosed Plaintiff with "Major

Depressive Disorder, recurrent, severe, without psychotic features," and gave Plaintiff a GAF score of 65.[1]  (*Id.*)  Dr. Castillo prescribed Celexa 20 mg, Klonopin 1mg, and Ambien 10mg.  (*Id.*)

Dr. James Reid treated Plaintiff for the first time on July 8, 2011.  (Doc. 11-8 at 8)  Dr. Reid noted that Plaintiff complained of "low back pain with tingling, numbness, and weakness in both lower extremities, but more prominent on the left side."  (*Id.*)  Further, Dr. Reid noted:

> The patient has a longstanding history of low back pain associated with occult spina bifida and apparently has had an MRI performed approximately 12 years ago.  At that time, he was considered disabled and has never engaged in any significant employment.  In 2000, he was involved in an automobile accident and sustained further injuries to his back.  X-rays performed in 2008 revealed compression fracture at L3-L1.  The patient also has a history of depression and has been followed by a psychiatrist.  However, he has been non-compliant with his medication.

(*Id.*)  Dr. Reid determined that Plaintiff had "markedly limited range of motion of the spine, but no local tenderness [was] detected."  (*Id.*)  In addition, Plaintiff exhibited "significant weakness of all muscle groups in the lower extremities" and "marked weakness of the dorsiflexion of the left foot."  (*Id.*)  Dr. Reid diagnosed Plaintiff with degenerative disc disease in the lumbar spine, occult spina bifida, depression, a history of compression fractures at levels L3-L1, and a "[p]ossible neurogenic bladder."  (*Id.* at 9)

Plaintiff had a follow-up appointment with Dr. Castillo on July 20, 2011.  (Doc. 11-8 at 12)  Plaintiff's father told Dr. Castillo that Plaintiff did immediately not fill his prescriptions "for financial reasons," and he had only been on the medication for two days.  (*Id.*)  Plaintiff reported he was "forgetful due to his medications and he missed his court date."  (*Id.*)  In addition, Plaintiff said he was "not sleeping with the medications."  (*Id.*)  However, "[h]is mother believed that the patient [had] improved since said medications were started."  (*Id.*)  Dr. Castillo discontinued the prescriptions for Ambien and Konopin, and prescribed "Seroquel 100 mg for sleep purposes."  (*Id.*)

Dr. Reid requested an MRI of Plaintiff's lumbar spine, which was taken on August 12, 2011.  (Doc. 11-8 at 9, 16)  (*Id.*)  According to Dr. Hansen, the image results from 2011 were "impaired by the

---

[1] Global Assessment Functioning ("GAF") scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.).  A GAF score between 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34.

patient's inability to cooperat[e] without positioning." (*Id.*) Dr. Hansen determined that Plaintiff had "disc desiccation and narrowing but no evidence of disc protrusion or encroachment on the spinal canal and neural foramina" at the L1-L2, L2-L3, L3-L4, L4-L5, and L5-S1 levels. (*Id.* at 16) Dr. Hansen found Plaintiff had "moderate facet arthropathy" throughout the lumbar spine. (*Id.* at 16-17) Further, he opined that Plaintiff had "[s]uperior end-plate compression deformity at L3 which has the appearance of old trauma and lesser changes noted at the superior end-plate at L1." (*Id.* at 17)

Dr. Roger Wagner performed a comprehensive internal medicine evaluation on September 1, 2011. (Doc. 11-8 at 19-24) He noted Plaintiff reported difficulties with his vision, low back pain, and having spina bifida occulta. (*Id.* at 19) Dr. Wagner found Plaintiff had "some astigmatism, [but] otherwise sees well," and his vision was "correctable with glasses." (*Id.* at 19, 23) Dr. Wagner noted:

> The claimant states that he can only walk short distances, however is easily able to walk without any apparent discomfort, a good 60 feet around the office here today without any apparent difficulty.  He was able to bend over easily at the waist, take off his shoes and pick them up.  The claimant subjectively states that he can sit for only 30 minutes, however was completely comfortable sitting here on today's exam.  He also gives a vague history of some "weakness" in the legs.  I did not note this on exam either.  He states that bending and lifting do cause pain.

(*Id.* at 20) According to Dr. Wagner, it was "unclear how much actual debility there is," because Plaintiff's mother was "urging him to do more and more exercise and it appears as though the claimant simply does not like to get up and do very much of anything." (*Id.*) Dr. Wagner found no "significant discomfort on any part of the exam…, except with the straight leg raise." (*Id.*)  Further, he determined Plaintiff's grip strength and muscle strength was "5/5" in his upper and lower extremities. (*Id.* at 23)

Based upon the examination, Dr. Wagner opined Plaintiff was able to stand and walk "[u]p to six hours, and had no limitations for sitting "with normal breaks." (Doc. 11-8 at 23) He believed Plaintiff was able to lift and carry "50 pounds occasionally and 25 pounds frequently." (*Id.*) Also, Dr. Wagner opined Plaintiff "should avoid climbing and balancing on ladders and scaffolds given cognitive difficulties, as well as perception to back pain and history of occasional falls," and "stooping should be limited to occasionally and frequently." (*Id.* at 23-24) Similarly, Dr. Wagner recommended Plaintiff "not work around heights or heavy machinery given the history of some stumbling." (*Id.* at 24)

Dr. Frankel completed a physical residual functional capacity assessment on October 4, 2011. (Doc. 11-8 at 25-29) Dr. Frankel opined Plaintiff was able to lift and carry 20 pounds occasionally and

5

10 pounds frequently; stand and/or walk for about six hours in an eight-hour day; sit for about six hours in an eight-hour workday. (*Id.* at 26) According to Dr. Frankel, Plaintiff was able to occasionally stoop; crouch; and climb ladders, ropes, and scaffolds. (*Id.* at 27) In addition, Dr. Frankel believed Plaintiff could frequently climb ramps and stairs, balance, kneel, and crawl. (*Id.*) Dr. Frankel did not find any manipulative, visual, communicative, or environmental limitations. (*Id.* at 27-28) Dr. Frankel noted these limitations were based upon a prior determination of an ALJ because Plaintiff did "not have a material change in his physical condition" since the decision date of January 20, 2006. (*Id.* at 29)

Dr. Aparna Dixit, a psychologist, reviewed the treatment records from Dr. Castillo and performed a mental status disability evaluation on October 29, 2011. (Doc. 11-8 at 30) Plaintiff complained of back pain, "a speech impairment in the form of stuttering," panic attacks, "distractibility, loss of interest, hypersomnia, and depressed mood." (*Id.*) Plaintiff reported that "since his car accident, he has been having petit mal seizures, and gets them at the rate of about twice a month." (*Id.*) Also, he told Dr. Dixit that he was taking psychiatric medication but it did "not provide any symptom relief." (*Id.*) Plaintiff reported he was "living with his friends," and he was "able to independently complete some activities of daily living, as well as perform "some simple household chores such as doing laundry and preparing simple meals with assistance." (*Id.* at 31) Dr. Dixit found Plaintiff was "able to remember 3 out of 3 objects immediately and 3 out of 3 objects in 3 minutes," and "perform simple mathematical problems." (*Id.*) For example, Plaintiff was "able to correctly do serial 3s" and "able to subtract 7 serially from 100." (*Id.*) Further, Plaintiff "demonstrated adequate insight and judgment," and scored a 30/30 on the Folstein Mini-Mental Examination. (*Id.* at 32) Dr. Dixit concluded:

> From a psychological standpoint, the claimant can understand, remember, and carryout simple instructions and will have no significant difficulty with remembering and carrying out detailed and complex instructions. He will have no significant difficulty dealing with the public. The claimant will have no significantly difficulty and relating to co-workers and supervisors. The claimant had no difficulty maintaining attention and concentration during this evaluation.

(*Id.*) Dr. Dixit diagnosed Plaintiff with Dysthymic Disorder, and believed Plaintiff would "benefit from continued psychiatric treatment and counseling." (*Id.*)

Dr. Pamela Hawkins completed a psychiatric review and case analysis on November 22, 2011.

(Doc. 11-8 at 33-47) Dr. Hawkins determined Plaintiff had mild restriction in his activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. (*Id.* at 41) She noted that, "[o]ther than dysthymic mood," the results from the consultative examination were "entirely [within normal limits]." (*Id.* at 47) Therefore, Dr. Hawkins opined Plaintiff's mental limitations were "non-severe." (*Id.* at 33, 47)

On January 11, 2012, Plaintiff had a follow-up appointment with Dr. Reid regarding his back pain, anxiety, and depression. (Doc. 11-8 at 49-50) Plaintiff said the pain was "severe," but he had "no muscle aches, no muscle weakness, and no swelling in the extremities." (*Id.* at 49) Dr. Reid opined that Plaintiff was "never likely to be able to engage in gainful employment." (*Id.* at 48) After Plaintiff requested physical therapy, Dr. Reid referred him to Rascal Creek Physical Therapy. (*Id.* at 49, 51)

Between January 20 and February 15, 2012, Plaintiff had twelve sessions of physical therapy. (*See* Doc. 11-8 at 51-71) At the initial evaluation, Plaintiff reported he suffered from "a constant, moderate pain and weakness in the central portion of his back," as well as "a constant, moderate pulling/radiating pain and weakness from the lower back to the posterior calf." (*Id.* at 51) Plaintiff described the pain as "3/10 with pain medication" and "8/10" without medication. (*Id.* at 52) He explained the pain was "aggravated by sitting, standing and bending;" and he estimated that he could sit or stand for about 30 minutes at a time, and walk "1/2 to 1 block." (*Id.* at 51) Also, Plaintiff said his pain disrupted his sleep 3 to 5 times each night. (*Id.*)

At the physical therapy sessions throughout January 2012, Plaintiff said his pain levels were decreasing. (*See* Doc. 11-8 at 55-62) On January 23, Plaintiff "report[ed] good benefit from [the] initial treatment with a decrease in intensity of pain in the legs." (*Id.* at 55) By January 25, Plaintiff reported he was "not having pain in his legs, central back only." (*Id.* at 57) At the fourth physical therapy appointment, Plaintiff reported he was "doing better with a decrease in pain," and said the lowest pain he had in the past 24 hours was a "2/10," with the highest level being "5/10." (*Id.* at 49) On January 30, Plaintiff said "his pain continue[d] to decrease to a minimum," and reported he did not take pain medication because his highest level of pain was "1/10 to 2-3/10." (*Id.* at 61) Heidi Hernandez, the physical therapist, determined that Plaintiff was "demonstrating increased strength and muscle coordination in the [lower extremities] and lumbopelvic musculature, with improved

endurance." (*Id.* at 62)

On February 1, 2012, Plaintiff reported he was "not having any pain" and was "feeling better with daily tasks." (Doc. 11-8 at 63) He said pain disrupted his sleep one or two times a night, and the most main he felt was "1/10 to 2-3/10." (*Id.*) Ms. Hernandez found Plaintiff's results on the lower limb tension test had decreased from "[h]ighly symptomatic" to "[m]ildly symptomatic." (*Id.* at 64) She noted that Plaintiff "continue[d] to demonstrate good improvement with a decrease in pain and increase in lumbopelvic stabilization." (*Id.*) On February 3, Plaintiff reported he was "getting significantly better with a decrease in pain to 2/10." (*Id.* at 65)

On February 6, 2012, Plaintiff reported he aggravated his back pain by "riding a mechanical bull." (Doc. 11-8 at 67) Plaintiff said his pain had increased to a "9/10," and he was "taking pain medication and resting to decrease his pain." (*Id.* at 67, 69) By February 10, his pain was decreasing, and he reported it was a "5/10" with pain medicine. (*Id.* at 75) Ms. Hernandez noted that Plaintiff's "[l]ower abdominal strength [had] increased to 3/5 with fair-lumbopelvic stabilization." (*Id.* at 76)

At the final physical therapy session on February 15, 2012, Plaintiff reported he was "50% better since beginning physical therapy" because he was "no longer experiencing radiating pain in his extremities," and "his legs [were] feeling stronger with improved stability." (Doc. 11-8 at 79) Plaintiff said he was able to sit for sixty minutes and stand for 30-45 minutes. (*Id.*) In addition, he said the lowest pain level he had experienced for the past 24-hours was "1/10 to 3/10," with his greatest level of pain being a "5/10." (*Id.*) Further, Ms. Hernandez noted that Plaintiff was "performing daily activities with less pain." (*Id.* at 80) Ms. Hernandez determined that with the twelve physical therapy sessions, Plaintiff's lumbar stabilization had improved; his abdominal strength had increased; and his "[b]ilateral lower extremity strength ha[d] increased to 4+/5 with fair endurance for activities." (*Id.*)

On June 8, 2012, Plaintiff visited an optometrist for an eye exam. (Doc. 11-8 at 85) Dr. Martin Miller determined Plaintiff had astigmatism in both eyes, and Plaintiff's distance visual acuity was 20/200 without correction, and 20/25 with correction. (*Id.*)

Dr. DeLa Rosa reviewed the record on June 18, 2012, and noted Plaintiff's symptoms had increased with physical therapy, and he had improved range of motion and stabilization of his spine. (Doc. 11-8 at 105) Dr. DeLa Rosa noted that "functional exam findings continue[d] to support no

worsening of limitations." (*Id.*, emphasis omitted)  In addition, Dr. DeLa Rosa found the MRI results did "not support severity of cord/nerve compression to expect progressive worsening." (*Id.*)  Therefore, Dr. DeLa Rosa concluded that Plaintiff was able to perform light exertional activities.  (*Id.* at 105)

Dr. Khan completed a psychiatric review and mental residual functional capacity assessment on June 19, 2012.  (Doc. 11-8 at 87-105)  Dr. Khan determined that Plaintiff had mild restrictions in his activities of daily living; no difficulties w social functioning; and moderate difficulties in maintaining concentration, persistence or pace.  (*Id.* at 85)  According to Dr. Khan, Plaintiff was "not significantly limited" with the ability to understand, remember, and carry out "very short and simple instructions;" and he was "moderately limited" with detailed instructions.  (*Id.* at 98)  In addition, Dr. Khan believed Plaintiff was "not significantly limited" with all other abilities related to concentration, persistence, social interaction, and adaptation.  (*Id.* at 98-99)  Dr. Khan concluded that Plaintiff was "able to understand and remember simple instructions" and "sustain attention for simple tasks for extended periods of two hour segments in an eight hour day." (*Id.* at 100)

**B.     Administrative Hearing Testimony**

Plaintiff testified that he took RSP classes in school because he had a learning disability, and he completed the eleventh grade.  (Doc. 11-3 at 31)  He reported that he dropped out of school after being in a car accident, and did not pursue a GED.  (*Id.*)  Plaintiff said he never attempted to find a job because he was "just too much in pain." (*Id.* at 32)  He did not believe he was able to work because the "nerves are really damaged" in his back and he had "weakness in [his] ankles and legs." (*Id.*)  In addition, Plaintiff said he had "bad thoughts and suicidal thoughts." (*Id.*)

He reported his back pain was located in the middle of his "lower spine," and the pain went down both of his legs to his ankles.  (Doc. 11-3 at 33-34)  Plaintiff said that "on a scale of 1 to 10, [with] 1 being the least amount of pain [and] 10 being so bad you'd have to go to the emergency [room]," his pain was "about a four" with his medication and seven without the medicine.  (*Id.* at 34)  He said he took Clonazepam and Tylenol 4 with Codeine for pain, starting "at 8:00 every morning." (*Id.* at 34-35)  Plaintiff reported that he had taken physical therapy, but it did not help.  (*Id.* at 42)

Plaintiff said that on a typical day, he sat in a recliner because his back got "stuck," and he would "get scared to, to get up." (Doc. 11-3 at 37)  Plaintiff said on the worst days, he would take

1  twenty minutes to get out of bed, and his brother helped him get dressed.  (*Id.* at 45) He estimated that
2  he spent "10, 12 hours a day" in the recliner, and got up "16, 17" times because of his pain.  (*Id.* at 37)
3  Plaintiff said he was able to sit for fifteen minutes at one time before he needed to stand, and stand
4  about twenty-five minutes at one time.  (*Id.* at 36)  Plaintiff said he was able to walk for only five
5  minutes, or about 20 to 25 feet, before he needed to stop.  (*Id.*)  In addition, he believed he was able to
6  lift up to thirty pounds.  (*Id.*)  Plaintiff also said he was unable to bend over, squat, climb ladders or
7  stairs, or twist his back.  (*Id.* at 37, 41)  He said he did not do any stretches or home exercises because
8  he was "scared."  (*Id.* at 45)
9       Plaintiff reported he felt depressed every day, and thought about "being in a grave, dying or
10 something, or falling off a, a swimming pool ladder."  (Doc. 11-3 at 44)  He stated that he had such
11 thoughts "[a]t least three times a day," for "about 15 minutes" each time.  (*Id.*)  In addition, Plaintiff
12 testified that he had suicidal thoughts where he "want[ed] to slice [his] wrist" about two times a day.
13 (*Id.* at 48)  He said these "crazy thoughts" disrupted his concentration and he was only able to focus on
14 reading for "about 10 minutes."  (*Id.* at 47-48)
15      He testified that he had two friends that visited about once a week, and watched television or
16 read with him.  (Doc. 11-3 at 49)  He said he did not go anywhere with his friends because he was
17 "constantly in pain."  (*Id.*)  Although Plaintiff said he knew how to cook, he said he did not because he
18 could not "stand more than about 15 minutes."  (*Id.* at 50)  He reported he folded his clothes, but did
19 not do laundry, take out the trash, or clean his room.  (*Id.* at 50-51)
20      Vocational expert Judith Najarian "VE" testified after the Plaintiff at the hearing. (Doc. 11-3 at
21 53)  The ALJ asked the VE to consider a worker "of Mr. Romero's age, education, and work
22 experience" with the ability to "perform light physical exertion." (*Id.* at 54)  The ALJ asked the VE to
23 assume the worker "can only occasionally stoop, crouch, and climb ladders, ropes or scaffolds, can
24 frequently balance, kneel, crawl, and climb ramps or stairs."  (*Id.*)  Further, ALJ limited the worker to
25 performing "simple, repetitive tasks." (*Id.*)  The VE testified a person with these abilities would be able
26 to perform work including as a bench assembler, bottle line attendant, and cafeteria attendant.  (*Id.*)
27      Next, the ALJ asked the VE to consider a worker who could "lift and carry 20 pounds
28 occasionally, 10 pounds frequently;" "stand and walk two to three hours in an eight-hour day;" and

"sit two to three hours in an eight-hour day, but must lie down about two hours in an eight-hour day." (Doc. 11-3 at 54) Further, the ALJ stated that the worker could "less than one-third of the time… climb, balance, stoop, kneel, crouch, or crawl." (*Id.*) The VE opined that an individual with these limitations would not be able to perform any jobs in the economy. (*Id.* at 55) Similarly, the VE stated that an individual who could not "maintain attention and concentration in increments of two hours through an eight-hour day" was unable to work in the national economy. (*Id.*)

## C. The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial activity after the application date of June 29, 2011. (Doc. 11-3 at 12) Second, the ALJ found Plaintiff "has the following severe impairments: depression, borderline intellectual functioning, degenerative disk disease, and arthritis." (*Id.*) These impairments did not meet or medically equal a listed impairment. (*Id.* at 12-14) Next, the ALJ determined:

> [Plaintiff] has the residual functional capacity to lift and carry up to twenty pounds occasionally, and ten pounds frequently; sit, or stand and walk, for six hours in an eight-hour work day; occasionally stoop, crouch, and climb ladders, ropes, or scaffolds; and frequently balance, kneel, crawl, and climb ramps and stairs; but can perform only simple, repetitive tasks.

(*Id.* at 14) With this residual functional capacity, the ALJ found Plaintiff was able to perform "jobs that exist in significant numbers in the national economy," including work as a bottle line attendant, cafeteria attendant, and bench assembler. (*Id.* at 18) Accordingly, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 19)

## DISCUSSION AND ANALYSIS

Plaintiff's sole argument in his appeal is that the ALJ failed to properly evaluate the credibility of his subjective complaints. (*See generally* Doc. 15 at 5-8) When evaluating a claimant's credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Next, the ALJ must make specific findings as to the claimant's credibility. *Id.* at 1036. An adverse credibility determination must be based on clear and convincing r where there is no affirmative evidence of malingering and "the record includes objective medical evidence establishing

11

that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).

## A. The ALJ's Credibility Analysis

Here, the ALJ determined Plaintiff's "medically determinable impairments can reasonably be expected to produce his alleged symptoms." (Doc. 11-3 at 15) However, the ALJ found his "statements about the intensity, persistence and limiting effects of [his] symptoms are not entirely credible." (*Id.*) To support this conclusion, the ALJ considered inconsistencies between Plaintiff's testimony and actions, the lack of treatment received, and the objective medical evidence. (*Id.* at 15-18)

Plaintiff argues that "[t]he ALJ failed to articulate legally sufficient reasons" to support the adverse credibility determination. (Doc. 15 at 8) On the other hand, the Commissioner argues that "the ALJ's credibility determination is entitled to deference because it was supported by substantial evidence, properly supported by the record, and 'sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding subjective symptoms.'" (Doc. 16 at 5, quoting *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). Significantly, the Ninth Circuit has determined factors considered by the ALJ are relevant to evaluate a claimant's credibility. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas*, 278 F.3d at 958-59.

### 1. Conflict between Plaintiff's testimony and conduct

The Ninth Circuit has determined an ALJ may rely upon inconsistencies with a claimant's "testimony and his own conduct" to support an adverse credibility determination. *Light v. Social Security Admin.*, 119 F.3d 789, 792 (9th Cir. 1997); *see also Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (an ALJ may use "ordinary techniques of credibility evaluation" including inconsistent statements "and other testimony by the claimant that appears less than candid"). Here, the ALJ noted Plaintiff testified that he could "walk for five minutes," up to about twenty to twenty-five feet. (Doc. 11-3 at 15; *see also id.* at 36) However, the ALJ noted that Dr. Wagner observed Plaintiff "walk without any apparent discomfort a good 60 feet around the office." (*Id.*) Further, the ALJ noted that, although Plaintiff testified that "he can sit for fifteen minutes," at the consultative examination Plaintiff "sat comfortably without any apparent back pain." (*Id.*) Thus, Plaintiff's testimony was not consistent

1  with his conduct at the examination with Dr. Wagner, and the inconsistencies between his testimony
2  and conduct supports the adverse credibility determination.
3   2. The medical record
4   In general, "conflicts between a [claimant's] testimony of subjective complaints and the
5  objective medical evidence in the record" can constitute "specific and substantial reasons that
6  undermine . . . credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir.
7  1999). The Ninth Circuit explained that "testimony cannot be rejected on the sole ground that it is not
8  fully corroborated by objective medical evidence," but "the medical evidence is still a relevant factor in
9  determining the severity of the claimant's pain and its disabling effects." *Rollins*, 261 F.3d at 857; *see
10 also Meanel v. Apfel,* 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's
11 failure to prescribe medical treatment as part of the credulity determination). Because the ALJ did not
12 base the credibility determination solely on the fact that the medical record did not support the degree
13 of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in evaluating
14 Plaintiff's credibility.
15  However, if an ALJ cites the medical evidence as part of a credibility determination, it is not
16 sufficient for the ALJ to make a simple statement that the testimony is contradicted by the record.
17 *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis
18 to support an adverse credibility determination"). Rather, an ALJ must "specifically identify what
19 testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*,
20 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an
21 ALJ "must state which . . . testimony is not credible and what evidence suggests the complaints are not
22 credible").
23  In this case, the ALJ noted that Plaintiff "alleges disability based on back problems and spina
24 bifida," but the "objective signs and findings are not particularly adverse." (Doc. 11-3 at 15) For
25 example, the ALJ noted that Plaintiff's MRI from August 2011 showed "fairly mild" multi-level
26 degenerative disk disease" and "no disk protrusion, spinal stenosis, or foraminal stenosis." (*Id.*) The
27 ALJ observed that Dr. Wanger found Plaintiff "demonstrated normal range of motion of the servical
28 [sic] and lumbar spine as well as all joints," and that Plaintiff had "5/5 muscle strength and tone in all

extremities." (*Id.*)  The ALJ also noted that, although Dr. Reid "found limited range of motion in the spine," Plaintiff demonstrated limited range of motion in the spine at examinations in July 2011 and January 2012, he improved with physical therapy. (*Id.* at 16)  As the ALJ found, the physical therapy notes indicated Plaintiff's "back was getting significantly better with a decrease of pain"—despite the fact that Plaintiff "aggravated his back by riding a mechanical bull"— and his legs were "stronger with improved stability." (*Id.*)

Further, the ALJ found Plaintiff's allegations of "disability based on depression, anxiety, nightmares, and a learning disability" were undermined by objective findings. (Doc. 11-3 at 17)  For example, the ALJ noted that Dr. Dixit determined that Plaintiff "could recall objects and solve simple math problems, exhibited insight and judgment, exhibited no symptoms of an anxiety disorder, and achieved a score of 30/30 on the Fullstein [sic] mini-mental exam." (*Id.*)

Accordingly, the ALJ carried the burden to identify specific objective evidence—including the findings of Dr. Wagner and Dr. Dixit—that undermined the credibility of Plaintiff's subjective complaints.  Thus, the medical record supports the adverse credibility determination. *See Greger*, 464 F.3d at 972; *Dodrill*, 12 F.3d at 918.

### 3. Effectiveness of treatment

When assessing a claimant's credibility, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. § 404.1529©.  Importantly, when an impairment "can be controlled effectively with medication," it cannot be considered disabling. *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).

The ALJ noted that Plaintiff "allege[d] disability based on imperfect visual acuity," but Dr. Wagner found that Plaintiff's "vision was correctable with glasses." (Doc. 11-3 at 12)  After Plaintiff received new glasses, his "visual acuity, with correction, was 20/25 OD and 20/25 OS." (*Id.*)  Further, the ALJ noted that Plaintiff's mother "reported improvement" after Plaintiff was prescribed medication by Dr. Castillo. (*Id.* at 17)  Thus, the effectiveness of the treatment received supports the ALJ's adverse credibility determination.

### 4. Delay in applying for benefits

The ALJ observed that Plaintiff "waited six months before filing a disability claim, which casts

1   doubt on the seriousness of his limitations." (Doc. 11-3 at 18) Plaintiff argues "the fact that Mr.
2   Romero applied for benefits 6 months after his onset has no bearing on his credibility." (Doc. 15 at 7)
3   On the other hand, Defendant contends this is relevant because "when one looks at the evidence from
4   the ALJ's point of view, there was no evidence of treatment prior to Plaintiff's application date." (Doc.
5   16 at 12) Significantly, however, Defendant's argument is contradicted by the medical record, which
6   indicates that Plaintiff complained of "low back pain" in 2008 and was referred to El Portal Imaging
7   Center to have x-rays taken of his lumbar spine. (*See* Doc. 11-8 at 2)

Because it is not clear how the delay between the alleged onset date and the application date undermines Plaintiff's credibility, this factor does not support the credibility determination.

## B.     Reliance on an invalid reason

When an ALJ sets forth a legally insufficient reason to support the adverse credibility determination, the Court must consider whether the reliance on an invalid reason was a harmless error. *See Batson v. Comm'r of the Soc. Sec. Admin*, 359 F.3d 1190, 1195-97 (9th Cir. 2003) (applying a harmless error standard where the credibility finding was invalid). The Ninth Circuit explained, "So long as there remains 'substantial evidence supporting the ALJ's conclusion's on credibility' and the error 'does not negate the validity of the ALJ's ultimate credibility conclusion,' such [error] is deemed harmless." *Carmickle*, 533 F.3d at 1162 (quoting *Batson*, 359 F.3d at 1197).

Here, the ALJ's finding regarding the six-month delay between the alleged disability date and the application date was legally insufficient. However, the ALJ set forth clear and convincing reasons for finding Plaintiff lacked credibility, including inconsistencies between his testimony and conduct, objective medical findings, and the effectiveness of treatment. Further, the RFC determination is supported by substantial evidence in the record, including the opinions of Drs. Wagner, Frankel, Dixit, De La Rosa, and Khan, who opined Plaintiff was able to perform light work with postural limitations, and had the mental capacity to perform simple, repetitive tasks.[2] (*See* Doc. 11-8 at 23, 26-27, 32, 100) Accordingly, the ALJ's partial reliance upon an invalid reason was a harmless error.

---

[2] When examining physicians such as Dr. Wagner and Dixit form opinions that "rest[] on… independent examination," the opinions are substantial evidence. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001); *see also Orn v. Astrue,* 495 F.3d 625, 632 (9th Cir. 2007) (when an examining physician provides independent clinical findings, such

15

**CONCLUSION AND ORDER**

For the reasons set for above, the Court finds the ALJ identified clear and convincing reasons to find Plaintiff's subjective complaints lacked credibility that were "sufficiently specific to permit the court to conclude the ALJ did not arbitrarily discredit [the] claimant's testimony." *Thomas*, 278 F.3d at 958. Therefore, the ALJ's determination that Plaintiff is not disabled must be upheld by the Court, because the ALJ set forth clear and convincing reasons to support the adverse credibility determination, supported by substantial evidence. *Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff Stephen Joey Romero.

IT IS SO ORDERED.

Dated:   **October 28, 2015**            /s/ Jennifer L. Thurston
                                                        UNITED STATES MAGISTRATE JUDGE

---

findings are substantial evidence in support of an ALJ's ultimate decision). The opinions of non-examining physicians—such as Drs. Frankel, DeLaRosa, and Khan—are substantial evidence when "consistent with other independent evidence in the record." *Tonapetyan*, 242 F.3d at 1149. Because the opinions of Dr. Wagner and Dr. Dixit were formed based upon their examinations of Plaintiff and administration physical and mental testing, their opinions qualify as substantial evidence. The opinion of Dr. Khan that Plaintiff is "able to understand and remember simple instructions and sustain attention for simple tasks" qualifies as substantial evidence because it is consistent with the opinion of Dr. Dixit. Similarly, the opinions of Dr. De La Rosa and Dr. Frankel that Plaintiff is able to perform light exertional work with some postural limitations is consistent with the opinion of Dr. Wagner, and constitute substantial evidence in the record.